IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| IN RE:     LANDAMERICA FINANCIAL GROUP, INC., et al., | Case No. 08-35994-KRH<br>Chapter 11<br>Jointly Administered |
| Debtors. | |

_____

FRONTIER PEPPER'S FERRY, LLC,

        Plaintiff,

v.                                        Adv. Pro. No. 08-03148

LANDAMERICA 1031 EXCHANGE SERVICES, INC.,

        Defendant.

_____

HOWARD FINKELSTEIN,

        Plaintiff,

v.                                        Adv. Pro. No. 08-03171

LANDAMERICA 1031 EXCHANGE SERVICES, INC.,

        Defendant.

_____

MATTHEW B. LUXENBERG, TRUSTEE OF THE
MATTHEW B. LUXENBERG REVOCABLE FAMILY
TRUST,

        Plaintiff,

v.                                        Adv. Pro. No. 09-03023

LANDAMERICA 1031 EXCHANGE SERVICES, INC.,

        Defendant.

_____

## **MEMORANDUM OPINION**

Before the Court are the cross-motions for partial summary judgment of the plaintiffs Frontier Pepper's Ferry, LLC ("Frontier"), Howard Finkelstein ("Finkelstein"), and Matthew B. Luxenberg, Trustee of the Matthew B. Luxenberg Revocable Family Trust ("Luxenberg" and together with Frontier and Finkelstein the "Plaintiffs"), on the one hand, and of the defendant, LandAmerica 1031 Exchange Services, Inc. ("LES" or "Debtor"), and the Intervenors, The Official Committee of Unsecured Creditors of LandAmerica Financial Group, Inc. (the "LFG Committee") and The Official Committee of Unsecured Creditors of LandAmerica 1031 Exchange Services, Inc. (the "LES Committee" and together with the LFG Committee the "Committees"), on the other hand.

The question presented by the cross motions for partial summary judgment is whether certain exchange funds and other consideration delivered to LES on behalf of the Plaintiffs for the purpose of facilitating three like-kind exchange transactions under § 1031 of the Internal Revenue Code constitute property of the bankruptcy estate of LES where the exchange funds were deposited into a commingled operating account of the Debtor.  On April 15, 2008, the Court issued a Memorandum Opinion in *Millard v. LandAmerica 1031 Exchange Services, Inc.*[1] wherein the Court addressed many of the same legal issues that are presented in these motions. The primary factor that distinguishes *Millard* from the motions at bar is that the exchange funds in *Millard* were deposited into segregated accounts whereas the exchange funds that are the subject of these motions were deposited into the commingled operating account of the Debtor. For many of the same reasons as previously enunciated in *Millard*, the Court answers the question presented by the cross-motions in these cases in the affirmative.  The exchange funds

---

[1] Adv. Pro. No. 08-03147-KRH.

are not held by the Debtor subject to an express trust or a resulting trust and cannot be excluded from property of the bankruptcy estate for that reason.

This case is one of over 100 adversary proceedings that have been brought, so far, by former customers of LES in connection with its chapter 11 bankruptcy case.  Each of these former customers asserts that money and other consideration deposited with LES to facilitate like-kind exchanges under § 1031 of the Internal Revenue Code was held in trust for its benefit and should be returned to it.  As of November 26, 2008, the date that LES filed its bankruptcy petition (the "Petition Date"), LES had approximately 450 uncompleted exchange transactions.  Each of these uncompleted exchange transactions was governed by a separate exchange agreement executed by LES and its former customer.

LES identified two primary types of exchange agreements that it had utilized in the course of its operations:  (a) agreements that included language contemplating that the applicable exchange funds would be placed into an account or sub-account associated with the relevant customer's name (the "Segregated Account Agreements"); and (b) agreements that did not include this "segregation" language (the "Commingled Account Agreements").  Approximately 50 of the uncompleted exchange transactions involved Segregated Account Agreements while the remaining approximately 400 of the uncompleted exchange transactions involved Commingled Account Agreements.

The Court entered a protocol order on January 16, 2009, wherein the Court stayed the litigation in all but five of the over 100 adversary proceedings (the "Protocol Order").  Five lead cases were selected to proceed on an expedited basis because they presented legal and factual issues that were common to certain of the other adversary proceedings.  Two of the select cases were representative of customers who had Segregated Account Agreements:  customers with escrow account agreements and customers with segregated exchange agreements.  The *Millard*

case, in which the Court issued its April 15, 2008, Memorandum Opinion, was representative of customers who had segregated exchange agreements.   In *Millard*, the Court held that the exchange funds held by LES in segregated accounts were property of its bankruptcy estate.

The three lead cases now before the Court are representative of customers who had Commingled Account Agreements:   those with type A agreements, those with type B agreements, and customers with hybrid type B agreements whereunder both cash and non-cash proceeds were transferred to LES.   As defined by the parties, Commingled Type A Cases generally involve the wire transfer of exchange funds to an LES account at SunTrust Bank; Commingled Type B Cases generally involve the deposit by LES of exchange funds into an LES account at SunTrust Bank.[2]   Other than the inclusion of non-cash proceeds, the hybrid agreements are otherwise Type B agreements.   Finkelstein's and Frontier's cases are representative of the "Commingled Type B" cases and Luxenberg's case is representative of the "Commingled Type A" cases.

By Order entered February 10, 2009, the Court divided the litigation involving the five lead cases into phases and limited the scope of the first phase to tracing of exchange funds, contractual interpretation of the exchange agreements, the existence of an express trust and the existence of a resulting trust.   Specifically, the Court declined to consider at this stage of the litigation whether the exchange agreements are, or should be, the subject of a constructive trust. Hearing was conducted on the cross-motions for partial summary judgment on April 16, 2009, at which counsel for the parties presented argument.   Pursuant to the terms of the Court's Protocol Order, all of the parties to the stayed adversary proceedings were permitted to file amicus briefs advocating their respective positions.

---

[2] *See* Joint Motion of Debtor and LES Committee for Order Establishing Scheduling Protocol, ¶ 8.

This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[3]  The Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 334 and the General Order of Reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (M) and (O), in which final orders or judgments may be entered by a bankruptcy judge.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

## Issues Presented

Plaintiffs contend that they are entitled to partial summary judgment because their exchange funds were held by LES in trust for their benefit, and, therefore, the exchange funds should be turned over to them outside of the bankruptcy pro rata distribution system.  LES and the Committees counter that all three Plaintiffs entered into agreements with LES to facilitate like-kind exchange transactions under Section 1031 of the Internal Revenue Code.  All three deposited money or other consideration (the "Exchange Funds") with LES which was in all respects treated as property of LES.  LES and the Committees point out that under the terms and provisions of the exchange agreements, the Plaintiffs each disclaimed all "right, title and interest" in and to the Exchange Funds and provided LES with exclusive rights of "dominion, control and use" of the Exchange Funds.  LES and the Committees assert that the Plaintiffs vested full authority over the Exchange Funds with LES; and, in so doing, transferred clearly more than bare legal title to the Exchange Funds.  LES promised to pay a defined rate of interest on the Exchange Funds and to repay the Exchange Funds at some future point in accordance with the contractual terms.  LES and the Committees therefore argue that the Exchange Agreements

---

[3]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  *See* Fed. R. Bankr. P. 7052.

created nothing more than a debtor-creditor relationship; and, as unsecured creditors of LES, Plaintiffs are not entitled to any recovery beyond that which the Bankruptcy Court grants to similarly-situated creditors in due course.

### Undisputed Facts

Plaintiff Luxenberg is a physician residing in California.  He is the trustee of the Matthew B. Luxenberg Revocable Family Trust, a trust created under California law.  Plaintiff Frontier is a Virginia limited liability company with its principal place of business in Richmond, Virginia. Plaintiff Finkelstein is an individual residing in Garden City, New York

Defendant Debtor LES is a wholly owned subsidiary of LandAmerica Financial Group, Inc. ("LFG").  On November 24, 2008, LES ceased doing business as a qualified intermediary for like-kind exchanges, and on November 26, 2008, it filed, along with LFG, a petition for relief under Chapter 11 of the United States Bankruptcy Code in this Court.  The LES Committee and the LFG Committee are both statutory committees appointed in the respective bankruptcy cases of LES and LFG.  The Committees were each granted leave to intervene in this action.

Prior to the Petition Date, LES was a qualified intermediary for like-kind exchanges consummated by taxpayers pursuant to § 1031 of the Internal Revenue Code, 26 U.S.C. § 1031 ("1031 Exchange").  A 1031 Exchange allows a taxpayer to defer the payment of tax that otherwise would be due upon the realization of a gain on the disposition of business or investment property.  *Id.*  In the typical transaction, an exchanger such as one of the Plaintiffs assigns its rights as seller under a purchase agreement for the disposition of business or investment property (the "Relinquished Property") to a qualified intermediary such as LES.  The purchaser of the Relinquished Property transfers the net sales proceeds directly to the qualified intermediary.

The exchanger must identify like-kind replacement property (the "Replacement Property") within 45 days.  The exchanger has 180 days to close on the Replacement Property.  *See id.*  The qualified intermediary purchases the Replacement Property and then transfers the Replacement Property to the exchanger.  In the event that the Replacement Property is not identified or closed within the specified time periods, then the qualified intermediary pays an amount equal to the net sales proceeds to the exchanger.  This series of transactions is governed by a written exchange agreement executed by the exchanger and the qualified intermediary.

In connection with its business as qualified intermediary for like-kind exchanges, LES maintained a general, multipurpose checking account at SunTrust Bank, Inc. ("SunTrust") since 1992.  This checking account was titled in LES' own name, bearing an account number with the last four digits "3318."  LES used this account as its general operating account.  The SunTrust account received cash from various sources including cash (i) in the form of certain customers' exchange funds, (ii) in the form of service fees charged to customers, (iii) in the form of interest, and (iv) in the form of returns on LES' investments.  LES disbursed funds from the SunTrust account to pay its expenses, to pay dividends to LFG, to make investments in other investment vehicles, and to purchase replacement property for customers who had not insisted that their exchange funds be deposited in segregated accounts.

LES used funds in the SunTrust account to invest in a variety of short-term investments, including money market mutual funds, short-term bonds, certificates of deposit, floating rate notes, and auction rate securities.[4]  The auction rate securities were held in a brokerage

---

[4]  In the ordinary course of its business, LES invested certain of the exchange funds that it had received from its former customers and which it had deposited into its Commingled Account.  Some of the invested exchange funds received by LES are now held in the form of illiquid auction rate securities as a result of the unprecedented recent and rapid economic decline.  As a consequence, LES does not have the ability from a liquidity standpoint to fund all of the exchanges it is contractually obligated to complete within the time parameters that § 1031 of the Internal Revenue Code requires as it had committed.  To permit one group of exchangers to recover their exchange funds

investment account at SmithBarney and SunTrust Robinson Humphrey.  Each evening, the aggregate cash balance in the SunTrust account was swept out into an LES overnight investment account and then returned to the SunTrust account the following morning.  The SunTrust account is referred to as the commingled account of LES (the "Commingled Account").

Plaintiffs Frontier, Finkelstein, and Luxenberg executed separate Exchange Agreements with LES (the "Exchange Agreements")[5].  The Exchange Agreements were identical as to certain key provisions regarding LES's control and use of the funds transferred to LES by Plaintiffs. The Exchange Agreements uniformly provide that Plaintiffs assigned to LES their rights as sellers under purchase agreements for three Relinquished Properties.  The net consideration from the sale of Plaintiffs' Relinquished Properties was initially deposited into the Debtor's Commingled Account.[6]  From the moment the Plaintiffs authorized LES to receive the proceeds of their Relinquished Property sales, LES commingled those funds and treated them as its own.

Section 2 of each of the Exchange Agreements provides in pertinent part:

(c) LES shall have sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds. . . . Taxpayer shall have no right, title, or interest in or to the Exchange Funds or any earnings thereon and Taxpayer shall have no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of the Exchange Funds. . . .

---

under a trust theory necessarily impacts all of the other exchangers adversely, whether similarly situated or otherwise.

[5]  The Luxenberg Exchange Agreement was executed on November 14, 2008.  The Finkelstein Exchange Agreement was executed on July 21, 2008.  The Frontier Exchange Agreement was executed on September 22, 2008.

[6]  On November 20, 2008, $1,430,813.96 of net proceeds from the sale of the Relinquished Property that Luxenberg had assigned to LES was wired into the Commingled Account.  On September 22, 2008, $1,189,830.50 of net proceeds from the sale of the Relinquished Property that Frontier had assigned to LES was wired into the Commingled Account.  On July 21, 2008, $1,482,316 of net proceeds from the sale of the Relinquished Property that Finkelstein had assigned to LES was wired into the Commingled Account.  As additional consideration for the sale of the Relinquished Property that Finkelstein had assigned to LES, a note secured by a mortgage on property located at 36-40 West 13th Street, New York, New York, in the amount of $2.1 million was made out and delivered to LES.

The Exchange Agreements differ with respect to Section 3.  Luxenberg's Exchange Agreement provides that "Taxpayer will receive interest on the Exchange Funds at . . . [accrual of interest at a certain rate] from the first business day following *LES' receipt of funds via wire transfer to the LES account in Richmond, Virginia, that it maintains at SunTrust Bank for the purpose of collecting taxpayers' exchange funds,* or from three business days after receipt in Richmond, Virginia, if sent by check . . . ." (emphasis added).[7]  In contrast, the Exchange Agreements executed by Frontier and Finkelstein provide that *"LES will deposit the Exchange Funds in an account maintained at SunTrust Bank in Richmond, Virginia,* and guarantees Taxpayer will receive interest on the Exchange Funds at . . . [accrual of interest at a certain rate] from the first business day following receipt of funds via wire transfer at Richmond, Virginia, or from three business days after receipt in Richmond, Virginia, if sent by check . . . ." (emphasis added).[8]

Section 4 of each of the Exchange Agreements sets forth the procedures for Plaintiffs to identify their Replacement Properties.  Section 5 of each of the Exchange Agreements sets forth the terms under which LES will acquire the Replacement Properties and transfer them to Plaintiffs.  Section 6 of each of the Exchange Agreements makes clear that the sole purpose of the Exchange Agreements is to facilitate the exchange of the Relinquished Properties for the Replacement Properties.  Section 6(c) of each of the Exchange Agreements limits the duties and obligations of LES.  That section provides:

> LES shall only be obligated to act as an intermediary in accordance with the terms and conditions of this Exchange Agreement and shall not be bound by any other contract or agreement, whether or not LES has knowledge of any such contract or agreement or of its terms or conditions.  LES has undertaken to perform only such

---

[7]  *See* Luxenberg Exchange Agreement at § 3(a).  The use of the plural possessive "taxpayers'" suggests that the funds of multiple customers are being deposited into the same SunTrust account.

[8]  *See* Frontier and Finkelstein Exchange Agreements at § 3(a).

duties as are expressly set forth herein, and no additional duties or obligations
shall be implied hereunder or by operation of law or otherwise.

Each of the Exchange Agreements contains an integration (or merger) clause in section 11

providing that "[t]his Exchange Agreement contains the entire understanding between and

among the parties hereto."

**Standard for Entry of Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure, made applicable to these proceedings by

Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment

should be granted "if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477

U.S. 317, 327 (1986).  In determining whether this showing has been made, the court must assess

the evidence in the light most favorable to the party opposing the motion.  *See, e.g.*,

*Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

The United States Supreme Court has made clear that summary judgment is not a

disfavored procedural shortcut, but rather an integral part of the Federal Rules, which are

designed "to secure the just, speedy and inexpensive determination of every action."  *Celotex*

*Corp. v. Catrett,* 477 U.S. at 32 (quoting Fed. R. Civ. P. 1); s*ee also Thompson Everett, Inc. v.*

*Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1322–23 (4th Cir. 1995); *Sibley v. Lutheran Hosp. of*

*Md., Inc.,* 871 F.2d 479, 483 n.9 (4th Cir. 1989); *Schultz v. Wills (In re Wills),* 126 B.R. 489, 494

(Bankr. E.D. Va. 1991).

A party moving for summary judgment bears the initial burden of demonstrating that

there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. at 322.

Summary judgment is appropriate only where there are no "disputes over facts that might affect

the outcome of the suit;" disputes over mere peripheral or irrelevant facts are not sufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party demonstrates that there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence to demonstrate that there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule— set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."); *see also Celotex Corp. v. Catrett,* 477 U.S. at 325; *RGI, Inc. v. Unified Indus., Inc.*, 963 F.2d 658 (4th Cir. 1992).

The parties all assert that summary judgment is appropriate in this case because there is no dispute as to any material fact regarding the subject transactions. Resolution of the matters in dispute involves the interpretation of three substantially similar contracts, none of which is ambiguous.[9] Furthermore, as all of the parties have filed motions for summary judgment, no party can be heard to complain that it will be deprived of a right to trial if summary judgment is entered.

## Discussion

Section 541 of the Bankruptcy Code provides for the creation of a bankruptcy estate upon the filing of a bankruptcy petition.[10] Property included within that estate is defined very broadly

---

[9]  It is important to determine whether the contracts are ambiguous, since "[i]f a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 235 (4th Cir. 2007).

[10]  Section 541 of the Bankruptcy Code provides in pertinent part:
(a)  The commencement of a case under section 301, 302, or 303 of this title creates an estate.  Such estate is comprised of all the following property, wherever located and by whomever held:
(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

to include every interest that a debtor has in property as of the commencement of the bankruptcy case, wherever located and by whomever held. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204-05 (1983) ("The House and Senate Reports on the Bankruptcy Code indicate that § 541(a)(1)'s scope is broad."); *Grochal v. Ocean Tech. Servs. Corp. (In re Baltimore Marine Indus.),* 476 F.3d 238, 240 (4th Cir. 2007) ("Section 541 of the Bankruptcy Code governs the composition of the bankruptcy estate and provides a broad definition of 'property of the estate.'").

In line with the broad definition of "property of the estate," money held in a bank account in the name of a debtor is presumed to be property of the bankruptcy estate. *See, e.g., In re Amdura Corp.,* 75 F.3d 1447, 1451 (10th Cir. 1996) ("We presume that deposits in a bank to the credit of a bankruptcy debtor belong to the entity in whose name the account is established."); *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.* (*In re U.S.A. Diversified Prods.*, *Inc.*), 100 F.3d 53, 55 (7th Cir. 1996) ("Property of the debtor is defined to include all legal or equitable interests of the debtor . . . and obviously that includes the interest that a depositor has in the money in his account, more precisely the money owed him by the bank by virtue of the account.") (internal quotations omitted); *Asurion Ins. Servs., Inc. v. Amp'd Mobile, Inc.* (*In re Amp'd Mobile, Inc.*), 377 B.R. 478, 483 (Bankr. D. Del. 2007) ("Property held by a debtor is presumed to be property of the estate."); *Sousa v. Bank of Newport*, 170 B.R. 492, 494 (D.R.I. 1994) (the bankruptcy estate "includes funds held in a checking or savings account"); *Stratton v. Equitable Bank*, N.A., 104 B.R. 713, 726 (D. Md. 1989) (funds deposited in an account owned and controlled by the debtor become the debtor's property).[11]

---

[11]  *See* 5 Collier on Bankruptcy ¶ 541.09 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. Rev. 2008) ("deposits in the debtor's bank account become property of the estate under § 541(a)(1)").

In this case, the facts mandate a presumption that the Exchange Funds are the property of the LES bankruptcy estate.  The Exchange Funds were derived from the proceeds of the sale of the Relinquished Properties that Plaintiffs had assigned to LES.  The Exchange Funds were transferred from the third party purchasers of these Relinquished Properties directly into the Commingled Bank Account of LES by the closing agents.  The transferred funds remained in that Commingled Bank Account through the Petition Date.  Plaintiffs never had any ability to withdraw the funds.  The Commingled Bank Account was and remains under the complete control of LES.  Only LES had the ability to disburse or withdraw the funds.  As LES maintained the Exchange Funds in its general operating account in its name and under its control and as LES had the right to use the funds to pay its own expenses, the money is presumably property of the LES bankruptcy estate.  *Boyer v. Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A. (In re USA Diversified Products, Inc.)*, 100 F.3d at 55 (estate property "includes the interest that a depositor has in the money in its account"); *Elsaesser v. Gale* (*In re Salt Lake City R.V., Inc.)*, No. 95-03264-7, 1999 WL 33486709, at *4 (Bankr. D. Idaho, March 17, 1999) ("[m]oney in a bank account under the debtor's control presumptively constitutes property of the debtor's estate. . . ."); *In re Amdura Corp.*, 75 F.3d at 1451 (10th Cir. 1996) (holding that the funds in the debtor's bank account were the property of the estate, where the debtor held the account exclusively in its own name, earned interest on the account, and had the right to use the funds to pay its own expenses and those of its subsidiaries, without any consideration of which subsidiaries had contributed funds to the account).

To rebut this presumption that the funds are property of the bankruptcy estate of LES, Plaintiffs must show that they retained some right to the funds.  Any such right to the funds must

be established as an interest in property recognized under state law.[12]  *Butner v. United States*,

440 U.S. 48, 55 (1979).  Plaintiffs contend that LES was temporarily holding the Exchange

Funds on their behalf solely for the purpose of facilitating the exchange of the Relinquished

Properties for the Replacement Properties.  Plaintiffs maintain that they never parted with their

equitable interest in the ownership of the Exchange Funds[13] and that LES was holding the

Exchange Funds in trust for Plaintiffs' benefit.  Therefore, they assert, although the Exchange

Funds may have been commingled in the general operating account of LES, the funds did not

become property of the LES bankruptcy estate.  11 U.S.C. § 541(d).[14]

Whether property in the possession of the Debtor is held in trust for Plaintiffs is a question

of state law.  *Butner*, 440 U.S. at 55.  While federal law creates the bankruptcy estate, state law

defines the scope and existence of the debtor's interest in property.  *Raleigh v. Ill. Dept. of

Revenue*, 530 U.S. 15, 20 (2000) ("The 'basic federal rule' in bankruptcy is that state law governs

the substance of claims, Congress having 'generally left the determination of property rights in the

assets of the bankrupt's estate to state law.'") (quoting *Butner,* 440 U.S. at 57).  LES and Plaintiffs

---

[12]  One of Plaintiffs' alternative arguments is that LES was acting as a mere conduit for the Exchange Funds; and, as
such, the funds are excluded from the LES bankruptcy estate pursuant to § 541(d) of the Bankruptcy Code as a
matter of federal common law.  In support, Plaintiffs cite *City of Springfield, Mass. v. Ostrander (In re LAN
Tamers),* 329 F.3d 204 (1st Cir. 2003); *T&B Scottdale Contractors, Inc. v. United* States, 866 F.2d 1372 (11th Cir.
1989).  In those cases cited by Plaintiffs in support of this position, the funds originated from a Federal program and
were earmarked for a specific statutory purpose.  That is not the case here where the Exchange Funds represent the
net proceeds of third party purchasers' acquisitions of Relinquished Properties.

[13]  Legal title to property and the equitable interest in property are separate property interests.  *See, e.g., In re
Halabi*, 184 F.3d 1335, 1337 (11th Cir. 1999).  Virginia law recognizes the beneficiary as "equitable owner of the
trust property."  *Broaddus v. Gresham*, 181 Va. 725, 26 S.E.2d 33, 36 (1943) (quoting 1 Scott on Trusts § 12.1, at 86
(1939)).

[14]  Section 541(d) of the Bankruptcy Code creates a limitation on the otherwise broad definition of property of the
estate.  That section provides in pertinent part that:
> "property in which the debtor holds, as of the commencement of the case, only legal title and not
> an equitable interest . . . becomes property of the estate under sub-section (a)(1) or (2) of this
> section only to the extent of the debtor's legal title to such property, but not to the extent of any
> equitable interest in such property that the debtor does not hold."

11 U.S.C. § 541(d).

agreed that the Exchange Agreements would be governed by Virginia law.[15]    That contractual

choice of law provision is determinative of the law to be applied in this case.  *See Holmes Envtl.,*

*Inc. v. SunTrust Banks, Inc. (In re Holmes Envtl., Inc.),* 287 B.R. 363, 374 (Bankr. E.D. Va. 2002)

(*citing Tate v. Hain,* 180 Va. 402, 410, 25 S.E.2d 321, 324 (1943)).

Under the terms of the Court's February 10, 2009, order, the question to be resolved at this

stage of the litigation is whether the Exchange Funds are excluded from property of LES'

bankruptcy estate because of the existence of either an express trust or a resulting trust.[16]    The

Court will look to the law of the Commonwealth of Virginia in analyzing these two issues.

Plaintiffs bear the burden of proving the existence of a trust.  *See Page v. Page*, 132 Va. 63, 110

S.E. 370, 372 (1922) (party seeking to establish a trust has the burden of proving its existence);

*Chiasson v. J. Louis Matherne & Assocs.* (*In re Oxford Mgmt., Inc.*), 4 F.3d 1329, 1335 (5th Cir.

1993) ("When the property of an estate is alleged to be held in trust, the burden of establishing the

trust's existence rests with the claimants.").

Under Virginia law, an express trust is created only where there is "an affirmative

intention to create it."  *Peal v. Luther*, 199 Va. 35, 37, 97 S.E.2d 668, 669 (1957); *Leonard v.*

*Counts,* 221 Va. 582, 588, 272 S.E.2d 190, 194 (1980) (an express trust is "based on the declared

intention of the trustor.").  The affirmative intention to create a trust may be established by "either

express language to that effect or circumstances which show with reasonable certainty that a trust

---

[15]    Section 11 of the Exchange Agreements provides that "[t]his Exchange Agreement shall be governed by and
construed in accordance with the applicable laws of the Commonwealth of Virginia without regard to the conflict of
laws provisions thereof . . . ."

[16]    The Court does not have under consideration at this phase of the litigation whether the imposition of a
constructive trust is appropriate.  A constructive trust "arise[s] by operation of law, independently of the intention of
the parties . . . ."  *Crestar Bank v. Williams,* 250 Va. 198, 204, 462 S.E.2d 333, 335 (1995) (citation omitted).  Such
trusts "occur not only where the property has been acquired by a fraud or improper means, but also where it has
been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained . . . ."
*Leonard v. Counts,* 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980) (citation omitted).  Many of the arguments
advanced by the Plaintiffs go to this issue.

was intended to be created." *Woods v. Stull*, 182 Va. 888, 902, 30 S.E.2d 675, 682 (1944); *Rivera v. Nedrich*, 259 Va. 1, 6, 529 S.E.2d 310, 312 (1999).

There is no express language in the Exchange Agreements that creates a trust. The words "trust," "trustee," or "beneficiary" do not appear anywhere in the Exchange Agreements. Given the omission of any language normally associated with the creation of a trust, Plaintiffs must demonstrate with "reasonable certainty" circumstances that show the parties to the Exchange Agreements nevertheless intended to create a trust. *Woods v. Stull*, 182 Va. at 902, 30 S.E.2d at 682.

The Court thus turns to an examination of whether Plaintiffs have demonstrated the parties' intent to create a trust despite the absence of express language to do so. Although formal or technical words are not necessary to create a trust, the fact that the Exchange Agreements make no mention of a "trust" is significant in determining whether a trust was intended. *See In re Estate of Vallery*, 883 P.2d 24, 27 (Colo. App. 1993). Here, not only is there an absence of any language that the parties intended to create a trust, but there is language in the Exchange Agreements that actually evidences an intent *not* to do so. Plaintiffs, in the Exchange Agreements, conveyed exclusive possession, dominion,[17] control and use of the Exchange Funds to LES. They also disclaimed any right, title or interest in and to the Exchange Funds. The conveyances, combined with the disclaimers, are inconsistent with the establishment of a trust. Under a trustee-beneficiary relationship, the trustee holds legal title to the trust property and the beneficiary holds an equitable interest in the trust property. *Kubota Tractor Corp. v. Strack*, Case No. 4:06cv145, 2007 WL 517492, at *4 (E.D. Va. Feb. 6, 2007) (citing *Broaddus v. Gresham*, 181 Va. 725, 731, 26 S.E.2d 33, 35 (1943)) (reversed on other grounds, *Kubota*

---

[17] "Dominion" has been defined by one court as "perfect control in right of ownership, and indicates that it was the intention to make the instrument as effectual as a conveyance as it was possible for the parties to make it." *Baker v. Westcott*, 11 S.W. 157, 159 (Tex. 1889).

*Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493 (4th Cir. 2008)).    However, Plaintiffs relinquished *any and all* interests in the property, including the equitable interest that a beneficiary of a trust would retain in trust property.    Plaintiffs expressly disclaimed the equitable interest that they now ask this Court to find that they otherwise somehow retained.

Further evidence that the parties did not intend the Exchange Agreements to create a trust can be found in the parties' agreement to limit the duties of LES to those expressly contained in the Exchange Agreements.    A trust necessarily requires the establishment of fiduciary duties. *See Restatement (3d) of Trusts § 2* (2003) (stating that a trust is a fiduciary relationship with respect to property); *In re NOVA Real Estate Inv. Trust*, 23 B.R. 62, 66 (Bankr. E.D. Va. 1982) ("A trust involves a duty of the fiduciary to deal with particular property for the benefit of another.").[18]    Fiduciary duties create a special relationship of trust and good faith that goes beyond the duties set forth in an ordinary contract between commercial parties.    *See Balbir Brar Ass'n v. Consol. Tracking Servs. Corp.*, At Law No. 137795, 1996 WL 1065615 at *5 (Va. Cir. Ct. October 1, 1996) (distinguishing between contract duties and fiduciary duties).

The parties to the Exchange Agreements acknowledged that LES was not undertaking any duties not expressly set forth in the Exchange Agreements (i. e. the contract duties) including any implied duties or any duties imposed by operation of law.    This limitation on the scope of LES' duties eliminates any argument that LES had a duty to act as a fiduciary for Plaintiffs. *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, Case No. 99-2330, 2000 WL 1288317, at *4 (4th Cir. Sept. 13, 2000) (holding that no fiduciary duties existed where the plaintiff "expressly consented (in the Consent Agreement) to the [defendants'] disclaimer of any

---

[18]    A trustee has a fiduciary obligation to act for the benefit of the trust beneficiary.    *See Continental Cas. Co. v. Powell,* 83 F.2d 652, 654 (4th Cir. 1936) ("There is a fiduciary relation between trustee and beneficiary; there is not a fiduciary relation between debtor and creditor.") (internal citations omitted); *Caldwell v. Hanes* (*In re Hanes*), 214 B.R. 786, 812 (Bankr. E.D. Va. 1997) ("The trustee . . . is a fiduciary of the trust beneficiaries.") (internal citations omitted).

fiduciary relationship toward it"). The Exchange Agreements provide that LES was acting in the narrow capacity of an exchange facilitator. The parties agreed that LES assumed no duties not expressly set forth in the Exchange Agreements, including fiduciary duties, and none can be implied or imposed by operation of law. LES merely had the contractual duty to effect the exchanges. The unambiguous language of the Exchange Agreements makes clear that LES and Plaintiffs intended their relationships to be relationships of contract obligor and obligee.

The Exchange Agreements were integrated contracts. *See Robinette v. Robinette*, 4 Va. App. 123, 354 S.E.2d 808, 810 (1987); *see also Lysk v. Criswell (In re Criswell)*, 52 B.R. 184, 197 (Bankr. E.D. Va. 1985) (holding that an integrated agreement containing a merger clause precluded parties from claiming any reliance on "terms, conditions, statements, warranties, or representations not contained [in the integrated agreement]"). Plaintiffs therefore cannot utilize extrinsic evidence to modify or alter the contracts' plain statements (i) that Plaintiffs had no interest, including any equitable interest, in or to the Exchange Funds and (ii) that LES owed to Plaintiffs no duty, including any fiduciary duty, not expressly set forth in the Exchange Agreements. *Robinette v. Robinette*, 4 Va. App. at 128, 354 S.E.2d at 810 (holding that a party cannot introduce parol evidence to show the existence of a trust if it would defeat or contradict the terms of an express agreement). The objective language of the Exchange Agreements precludes consideration of any subjective belief that the parties may have had regarding the relationship between them. *Boone v. U.S. Attorney*, Case No. 7:06VA00006, 2006 WL 1075010, at *3 (W.D. Va. Apr. 21, 2006) ("Boone may have had a subjective intent to the contrary, but it is the objective manifestation of intent, as shown by the words used in the agreement, that governs.").

Plaintiffs maintain that they intended for the Exchange Funds to be held in escrow by LES and that their funds were to be used only for the acquisition of the replacement properties.

They argue that the Fourth Circuit has held that an escrow arrangement is a specialized type of express trust under Virginia law. *Old Republic Nat'l Title Ins. Co. v. Tyler (In re Dameron),* 155 F.3d 718, 722 (4th Cir. 1998). Plaintiffs point to various provisions of their Exchange Agreements such as (i) section 6(b) wherein LES acknowledges that it entered into the agreement solely to facilitate the tax deferred exchanges, (ii) section 2(a) wherein LES agreed to hold and apply the Exchange Funds in accordance with the terms of the agreement, (iii) section 2(b) wherein LES  stated that it would use the Exchange Funds to purchase the replacement properties, (iv) section 3(a) wherein LES unconditionally guaranteed the return and availability of the Exchange Funds, and (v) section 1(c) wherein LES promised to return the funds if closing on the Replacement Properties did not occur within the stated time period. Like the title company in *Dameron*, Plaintiffs argue, LES was serving as an escrow agent holding and disbursing the funds under certain specified contingencies.

The term "escrow" (like the word "trust") is notably absent from the parties' Exchange Agreements. In *Dameron*, the Forth Circuit found the parties' real estate closing instructions exhibited an intention to create a trust. Those instructions stated that "[y]ou may not cash, deposit, or disburse our funds until you have fully complied with all instructions." 155 F.3d at 721 n.2. The Exchange Agreements did not similarly restrict LES' use of the funds. Rather, LES was vested with all legally-cognizable indicia of ownership. LES was given sole and exclusive possession, dominion, control and use of the Exchange Funds. LES bore the risk of any bad investments it made and was free to use the funds to operate its business activities without any limitations whatsoever.

The Restatement of Trusts provides that if the parties to an agreement intend that the person receiving money will have the unrestricted use of it, being liable to pay a similar amount back to the payor, with or without interest, a debt is created. Restatement (Third) of

Trusts § 5(k). *See also Altura P'ship v. Breninc., Inc. (In re B.I. Fin. Servs. Group, Inc.)*, 854

F.2d 351, 354 (9th Cir. 1988). ("[l]ack of control by the payor over treatment of its money is

an indication of the establishment of a debtor-creditor, not trust, relationship."); *In re Morales*

*Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) (holding that there was a debtor-creditor

relationship, rather than a trustee-beneficiary relationship, where the payor did not require the

debtor to keep its proceeds separate from debtor's own funds and where there was no specific

restriction placed upon the debtor's use of the payor's proceeds).

As the Exchange Funds were held in the commingled operating account of LES and as

LES maintained both control over those funds and had the unrestricted right to use those funds

as it saw fit, the funds cannot be said to have been held in escrow. *Dameron*, 155 F.3d 718, is

simply inapplicable to this case and, under the facts presented here, cannot form the predicate

for finding an express trust.

Further confirmation of this point can be found in the agreement of LES to pay interest

to the Plaintiffs on the Exchange Funds at a fixed rate. Again the Restatement of Trusts

provides that

> "[i]f there is an understanding between the parties that the person to whom funds
> are transferred is to pay 'interest' thereon (at a fixed or current rate, and not merely
> such interest or other earnings as the funds, being invested, may earn), it becomes
> close to certain that the relationship is a debt rather than a trust. Interest is
> normally paid for the 'use of funds.' Accordingly, recipients of funds who pay
> interest are, in the absence of a definite understanding to the contrary, borrowers
> who are entitled to use the funds for their own purposes."

Restatement (Third) of Trusts § 5(k) cmt. k; *see also Weststeyn Dairy 2 v. Eades Commodities*

*Co.,* 280 F. Supp. 2d 1044, 1076-1077 (E.D. Cal. 2003) (agreement to pay fixed rate of interest

is "more indicative of a debt than a trust"). LES bore all the risk associated with ownership of

the funds. The parties' arrangement resembles that of a bank account, not an escrow account.

20

Plaintiffs also have the burden of proving their ability to trace the property alleged to be held in trust.  *See Dameron,* 155 F.3d at 723 ("[A] party claiming entitlement to a trust must be able to trace its assets into the fund or property that is the subject of the trust."); *Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.),* 67 B.R. 198, 213 (Bankr. D. Nev. 1986) ("A party who wishes to exempt trust property from the estate must not only prove the existence of the trust relationship, but must also specifically identify the trust property in either its original or substituted form.").    The tracing of trust property is governed by federal law.  *See In re Dameron,* 155 F.3d at 723.  Plaintiffs cannot possibly satisfy the tracing requirement.  The net proceeds realized from the sale of Plaintiffs' relinquished properties were commingled in the general operating account of LES along with the proceeds from other exchange transactions and along with LES's own funds and investments.  The commingled funds were disbursed to pay for exchanges of other exchange customers and to fund LES's operations.  Nor is the lowest intermediate balance test available to resolve this issue, as it was in *Dameron.*  The operating account of LES was swept daily.  Once the account went to zero, tracing became impossible as a matter of law.  "[E]ven assuming the existence of a trust relationship, a creditor cannot sufficiently identify or trace the trust res through a commingled fund where the fund is too small to satisfy the claims of similarly situated parties."  *In re Lemons & Assocs.,* 67 B.R. at 213.

Finally, the intention of the parties not to create an express trust can be gleaned from their decision to use the qualified intermediary option from among the four safe harbor options available within the Treasury Regulations.  Qualified intermediaries are not the only means for effectuating like-kind exchange transactions under § 1031.  Treasury Regulation § 1.1031(k)-1(g), which addresses the delivery of funds to third-parties in connection with a 1031 Exchange, provides, in pertinent part, as follows:

Safe harbors - - (1) In general. Paragraphs (g)(2) through (g)(5) of this section set forth four safe harbors the use of which will result in a determination that the taxpayer is not in actual or constructive receipt of money or other property for purposes of section 1031 and this section. . . .
(2) Security or guarantee arrangements.
. . . .
(3) Qualified escrow accounts and qualified trusts
. . . .
(4) Qualified Intermediaries
. . . .
(5) Interest and Growth Factors

Treas. Reg. § 1.1031(k)-1(g). These safe harbors are not mutually exclusive. *See* 26 Treas. Reg. § 1.1031(k)-1(g)(1) ("More than one safe harbor can be used in the same deferred exchange, but the terms and conditions of each must be separately satisfied."). Plaintiffs and LES had the option to utilize a "qualified escrow" or to establish a "qualified trust" pursuant to subsection (g)(3) of the Treasury Regulation. The qualified trust option requires a written trust agreement. 26 C.F.R. § 1.1031(k)-1(g)(iii)(B). Instead of using either of these available options, the parties chose the "qualified intermediary" safe harbor. The Exchange Agreements specifically state that: "LES and Taxpayer acknowledge and agree that this Exchange Agreement is intended to satisfy the safe harbor provisions of Section 1.1031(k)-1(g)(4) of the Regulations." Exchange Agreement at ¶6(a). The parties did not in addition separately satisfy the terms and conditions of the Treasury Regulations for the creation of either a qualified escrow or a qualified trust. As the LES Committee points out in its brief, the parties' decision to eschew the escrow and trust provisions of the tax code in favor of a different safe harbor evidences that there was no intention to create a trust relationship. The Court thus finds that no express trust was created in any of the three 1031 Exchange transactions at issue.

The holdings in the two cases that previously have considered whether commingled funds of 1031 exchange customers held in the name and accounts of a debtor are property of the bankruptcy estate are entirely consistent with the Court's holding here. The Bankruptcy

22

Court for the District of Minnesota has held that exchange funds received by a qualified intermediary in connection with a 1031 exchange were property of the debtor's estate. *Manty v. Miller & Holmes, Inc.* (*In re Nation-Wide Exch. Servs., Inc.),* 291 B.R. 131, 143 (Bankr. D. Minn. 2003). This determination was based on a number of factors, all of which are present in this case:

> The initial commingling of [taxpayer's] funds with those of the Debtor's other clients was not expressly forbidden by the terms of the [Exchange] Agreement. Nowhere does either Agreement specify that the Debtor was to hold the proceeds in a segregated form or account. In point of fact, Term 8 gave the Debtor a discretionary power to choose the form in which it was to hold and invest the proceeds . . . . The lack of specific client instructions to segregate proceeds, and the Debtor's exercise of substantial control over the funds under contractual warrant, mean that the funds became Debtor's property upon receipt . . . .

*Id*. (internal quotations omitted).

Similarly, the Bankruptcy Court for the Southern District of California has held that where a qualified intermediary commingled the proceeds it received from its various 1031 exchange customers, deposited those proceeds into general bank accounts held in the debtor's name, and further commingled those proceeds with income from transaction fees that it charged clients for performing as a qualified intermediary, the funds were property of the debtor's estate. *Taxel v. Vaca (In re San Diego Realty Exch., Inc.),*132 B.R. 424, 429 (Bankr. S.D. Cal. 1991).

As the Court has found that the parties to the Exchange Agreements did not intend to create an express trust, Plaintiffs are not now entitled to the imposition of a resulting trust. In Virginia, a resulting trust is "an indirect trust that arises from the parties' intent or from the nature of the transaction and does not require an express declaration of trust." *1924 Leonard Rd., L.L.C. v. Roekel,* 272 Va. 543, 552, 636 S.E.2d 378, 383 (2006) (citing *Tiller v. Owen,* 243 Va. 176, 180, 413 S.E.2d 51, 53 (1992); *Salyer v. Salyer,* 216 Va. 521, 525, 219 S.E.2d 889, 893

(1975)).  The party seeking to establish such a trust must do so by clear and convincing evidence.

*Id.* (citing *Leonard v. Counts,* 221 Va. 582, 589, 272 S.E.2d 190, 195 (1980)).

"For a resulting trust to arise, the alleged beneficiary must pay for the property, or assume payment of all or part of the purchase money before or at the time of purchase, and have legal title conveyed to another without any mention of a trust in the conveyance." *1924 Leonard Rd.,* 272 Va. at 552, 636 S.E.2d at 383 (citing *Morris v. Morris,* 248 Va. 590, 593, 449 S.E.2d 816, 818 (1994)).  *See also Tiller*, 243 Va. at 180, 413 S.E.2d at 53; *Leonard,* 221 Va. at 588, 572 S.E.2d at 194 (1980).  In *Morris,* the Supreme Court of Virginia quoted its prior opinion in *Kellow v. Bumgardner,* 196 Va. 247, 83 S.E.2d 391 (1954):

> The existence of a resulting trust thus depends upon an equitable presumption of intention, based upon the natural precept that one who advances the purchase money for real property is entitled to its benefits.  Therefore, after it has been shown that payment of all or a part of the purchase price for property has been paid by one person and title thereto has been placed in the name of another, the factor which will determine whether the title is to be impressed with a trust in favor of the payor is the intention of the party providing the purchase money.  If no evidence of intention is available, then the presumed intention will stand; *but if there is evidence that the person who provided the money had some intention other than to secure the benefits for himself, the presumed intention fails and no resulting trust will be recognized.*

*Morris*, 248 Va. at 593, 449 S.E.2d at 818 (quoting *Kellow,* 196 Va. at 255, 83 S.E.2d at 396) (emphasis added).

In this case the parties entered into fully integrated Exchange Agreements that evidenced an intention not to create a trust.  The Court need not divine the intent of the parties from the surrounding circumstances.  The parties' intentions are readily discernible from the Exchange Agreements themselves.  These were complex, fully-documented, commercial transactions.  The parties represented to each other that they were separately represented by

counsel and had the advice of other financial professionals.[19]  If the parties had wanted to create a trust or if they had wanted to create an escrow, they certainly were capable of doing so.  They did not.  A resulting trust cannot be imposed in the face of Exchange Agreements that demonstrate clearly a contrary intent.  The Court thus finds that no resulting trust was created in any of the three 1031 Exchange transactions at issue.  This result obtains without regard to the considerable hurdle that Plaintiffs would otherwise have to overcome that a resulting trust must be established through clear and convincing evidence.

Finally, the Court's holding that the Exchange Funds are not excluded from property of the bankruptcy estate because they are not the subject of an express or resulting trust does not lead to an inequitable result.  Rather, it furthers one of the primary policies of bankruptcy law – equitable distribution among similarly situated creditors.  Impressing the Debtor's funds with the claims of 450 different trusts would, in the end, serve no constructive purpose.[20] Each adversary proceeding would have to be litigated to conclusion in order to sort out the proper entitlement of the different trusts to the funds.  The scope and complexity of such litigation threatens to consume the entire estate.  It would most certainly severely diminish the amount available for distribution to the exchange customers.  It will also take years to finally resolve all the cases.  The bankruptcy process is designed to address and resolve this very kind of collective action problem.  The similarly situated commingled exchangers should be given equal treatment in a prioritized and ratable distribution of estate assets.  This can be best accomplished through the plan confirmation process.  While it may not be the perfect remedy,

---

[19]  For example, Section 11 of the Exchange Agreements provides that:  "Each party hereto and their legal counsel have reviewed this Exchange Agreement and have had an opportunity to revise (or request revision of) this Exchange Agreement and, therefore, any usual rules of construction requiring that ambiguities are to be resolved against a particular party shall not be applicable in the construction and interpretation of this Exchange Agreement."

[20]  The court notes that it has yet to address the claims that the Exchange Funds should be impressed with a constructive trust.

it does offer the most inexpensive and expeditious method for distributing these funds on a ratable basis to those who deserve to receive them.

### Conclusion

The Exchange Funds are not excluded from property of the estate pursuant to 11 U.S.C. § 541(d) because of the existence of an express trust or as a result of the imposition of a resulting trust.   The plain, unambiguous language of the Exchange Agreements clearly establishes that it was not the intent of LES or Plaintiffs to create an express trust.   As the Exchange Agreements were integrated contracts, Plaintiffs cannot use parol evidence to prove the existence of an express trust.   Given the parties' clear intent in the Exchange Agreements not to create an express trust, it is inappropriate for the Court to impose a resulting trust upon them.   This is especially true in this case in which the parties have represented that they relied upon the advice of their own legal and financial professionals, and in which the parties have included a merger clause in their agreement.   Therefore, the Court will deny Plaintiffs' motion for partial summary judgment and grant partial summary judgment in favor of the Debtor and the Committees against Plaintiffs.   Separate orders shall issue.

ENTERED:   _____

_____/s/ Kevin R. Huennekens_____
UNITED STATES BANKRUPTCY JUDGE

Copies to:

Lawrence O. Kamin
Terence K. McLaughlin
Elizabeth J. Bower
Willkie Farr & Gallagher, LLP
787 Seventh Avenue
New York, NY 10019

Dion W. Hayes
John H. Maddock, III
McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219

Craig A. Wolfe
Robert S. Friedman
Eric B. Post
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178-0002

Bruce E. Arkema
Kevin J. Funk
Ronald A. Page, Jr.
Cantor Arkema, P.C.
1111 East Main Street, 16th Floor
P.O. Box 561
Richmond, VA 23218-0561

Bruce H. Matson
Christopher L. Perkins
LeClair Ryan, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, VA 23219

Jeffrey S. Sabin
Mark M. Elliott
Justin G. Imperato
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

Charles R. Gibbs
Keefe Bernstein
Sarah Link Schultz
Akin Gump Strauss Hauer & Feld LLP
1700 Pacific Avenue, Suite 4100
Dallas, TX 75201

Mary A. House
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, NW
Washington, DC 20036

Lynn Tavenner
Paula S. Beran
Tavenner & Beran., PLC
20 North Eighth Street, Second Floor
Richmond, VA 23219

Robert B. VanArsdale
Assistant U. S. Trustee
701 East Broad Street, Suite 4304
Richmond, VA 23219

Yann Geron
Fox Rothschild LLP
100 Park Avenue, 15th Floor
New York, NY 10017

C. Thomas Ebel
William A. Gray
Jeffrey H. Geiger
William A. Burgess
Sands Anderson Marks & Miller
801 East Main Street, Suite 1800
P. O. Box 1998
Richmond, VA 23218-1998

Wyatt B. Durrette, Jr.
Barrette E. Pope
Elizabeth L. Gunn
DurretteBradshaw PLC
600 East Main Street, 20th Floor
Richmond, VA 23219

Jay S. Geller
Bernstein Shur
100 Middle Street
PO Box 9729
Portland, ME  04104-5029